IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:20-cr-115 |
| Plaintiff, | : | Judge Matthew W. McFarland |
| v. | : | |
| DEMETRIUS WILLIAMS, | : | |
| Defendant. | : | |

**ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS (Docs. 18 & 27)**

In relation to a nearby shooting that had just occurred, Cincinnati Police Department (CPD) officers pulled over a white Infinity SUV driven by Defendant Demetrius Williams. While Mr. Williams was being detained in the back of a police cruiser, CPD officers immediately began searching his SUV. They recovered (among other things) a handgun, ammunition, two baggies of suspected drugs (fentanyl), and other paraphernalia. Based on this evidence, Mr. Williams is presently charged with (1) possession of fentanyl with intent to distribute, (2) possession of a firearm in furtherance of an offense, and (3) felon in possession of a firearm. Mr. Williams now moves to suppress the evidence based on alleged violations of his Fourth Amendment rights. (*See* Motions to Suppress, Docs. 18 & 27.) The Court held a hearing on July 12, 2021 (*see* Transcript, Doc. 29), after which both parties filed supplemental briefs (*see* Docs. 33 & 35), making this matter ripe for review. For the reasons below, Mr. Williams' Motions to Suppress (Docs. 18 & 27) are both **DENIED**.

**FACTS**

The following facts are adduced from the parties' briefs (*see* Docs. 18, 20, 27, 33 & 34) and the July 12, 2021 evidentiary hearing (*see* Transcript, Doc. 29), at which CPD Officer St. John testified and various exhibits were presented.

On July 12, 2020, CPD officers Greene and St. John were parked in their cruiser on the 700 block of East Ridgeway Avenue. Around 3:50 P.M., the officers heard six to eight gunshots fired from what sounded like the 500 block of the same street. Although their cruiser was parked slightly around the bend and across Reading Road, Officer St. John testified that her partner, Officer Greene (who did not testify at the hearing), had a clear view of where the gunfire had emanated. Officer Greene noted aloud that she saw a white SUV, later determined to be Mr. Williams' car, leaving the scene and erratically driving backwards down Ridgeway (a residential street) at a high rate of speed. Based on the SUV's close proximity to where the shots had been fired, shortly after they had been fired, and the evasive manner in which it was driving away, the officers radioed it in and started following in pursuit. Moments later, the officers caught up with the SUV as it was turning onto Reading Road. Both officers personally observed the SUV continue to drive in a reckless manner and cut off multiple cars. Officer St. John, who was sitting in the passenger seat, wore a body camera that recorded all of the following events. (*See* Gov.'s Exhibit 3.)

Less than a minute later, the officers heard over the radio that a small group of people had flagged down a Sheriff's Deputy and reported that they had just been shot at multiple times. The victims reported that the shooter (1) shot at them on the 500 block of

2

Ridgeway, (2) was driving a white Infinity SUV (early 2000s model) with dark tint, and (3) was last seen driving north on Reading Road—all of which was entirely consistent with the officers' own observations. (These victims later made reports to officers about the shooting and were known to the officers.) Officer St. John can be heard audibly muttering, "Oh my god," before radioing in "we're *behind* that vehicle . . . ." (Gov.'s Ex. 3 at 00:43.)

The officers continued trailing the SUV for an additional 30 to 45 seconds, before making a left turn and activating their siren. Officers Greene and St. John quickly exited their cruiser with guns drawn. Mr. Williams immediately obeyed all their instructions—he threw his keys onto the street, exited the vehicle, and walked backwards towards them with his hands in the air. The officers ordered him to get on his knees, keep his hands up, and not move. He calmly complied. The officers frisked and escorted him to the back of their cruiser where, after a brief interaction including a reading of his *Miranda* rights, Officer St. John informed him as to why he was stopped (*e.g.*, they saw his car driving away from where they heard the gunshots being fired). Mr. Williams responded that he lives on the street.

At this point, additional CPD officers had arrived at the scene. At the 4:30 mark of Exhibit 3, Officer St. John is seen leaving Mr. Williams cuffed in the backseat of her cruiser and walking toward the SUV. All four doors were open, and CPD officers were actively searching the vehicle. Body cam footage (*see* Gov.'s Exs. 3 & 4) closely documents the scope of the officers' search, which was thorough—officers can be seen combing through the car and removing door side panels. During the search, officers recovered a

3

Glock 27 .40 caliber handgun (hidden in a hollow space behind the radio console), 69 rounds of ammunition (including rounds in a "hub-style extended magazine"), multiple .40 caliber shells, two digital scales, multiple empty baggies, four cell phones, and two baggies of fentanyl (in the same hidden area where the gun was found)—all of which comprise the evidence against Mr. Williams on the currently pending charges.

## LAW AND ANALYSIS

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const., amend. IV. Warrantless searches or seizures are "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (citations omitted). With regard to persons, "[t]here are three categories of interaction between police and citizens: consensual encounters, temporary detentions (or *Terry* stops), and arrests." *United States v. Ushery*, 968 F.2d 575, 578 (6th Cir. 1992). An officer must have a reasonable suspicion to conduct a temporary detention and probable cause to conclude an arrest. *Id.* With regard to property, the Fourth Amendment generally requires police to obtain a warrant before performing a search. *Carter v. Parris*, 910 F.3d 835, 839 (6th Cir. 2018). But there are exceptions to this requirement. One of them is the "automobile exception," *California v. Acevedo*, 500 U.S. 565, 578 (1991), which permits law enforcement to search a vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime. *Carter*, 910 F.3d at 839.

Since no warrants were ever issued in this case, Mr. Williams invokes the fruit of the poisonous tree doctrine, *see Wong Sun v. United States*, 371 U.S. 471, 488 (1963), and moves to suppress all evidence obtained from the July 12, 2020 traffic stop based on alleged Fourth Amendment violations. He argues that (1) there was no valid basis for the traffic stop, (2) his temporary detention in the back of the cruiser was unjustified and unreasonable, and (3) the warrantless search of his SUV was unlawful. The dispositive question to each of these three arguments is whether an exception to the warrant requirement applies. The Court will discuss each argument in turn.

## I. Traffic Stop

Mr. Williams first contests the validity of the initial traffic stop. It is well-settled that "[i]n order to effect a traffic stop, an officer must possess either probable cause of a civil infraction (for example, a traffic violation) or reasonable suspicion of criminal activity." *United States v. Lambert*, 770 F. App'x 737, 739 (6th Cir. 2019) (cleaned up). Here, the government had both.

***Probable Cause.*** First, the traffic stop was based on probable cause that Mr. Williams had just committed multiple civil traffic infractions. "Probable cause to conduct a traffic stop is conferred where, as here, an officer observes a motorist violate a traffic law." *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (cleaned up). In total, Mr. Williams was cited for three separate violations: (1) driving without a license in violation of Ohio Rev. Code Ann. § 4510.12; (2) using tinted glass and other vision obscuring material in violation of Ohio Rev. Code Ann. § 4513.241; and (3) illegal backing in violation of Cincinnati Municipal Code § 506-28. (*See* City of Cincinnati v. Demetrius

5

Williams, Case No. 20/TRD/14650, July 13, 2020.) Mr. Williams does not contest that the officers had probable cause to initiate the traffic stop based on the license and tinted window violations. Instead, he only challenges the validity of the illegal backing violation. But since the stop was undisputedly valid based on either (or both) of the other two violations, Mr. Williams argument fails.

Furthermore, Mr. Williams' challenge of the illegal backing violation lacks merit. True, Officer St. John testified that she could not see the illegal backing because her view was obstructed by the partition in their cruiser. (Transcript, Doc. 29, 10:8-13.) And Officer Greene—who actually observed the illegal backing—did not testify at the hearing. But she did narrate her observations out-loud and in real-time to her partner, Officer St. John, who did testify. *See United States v. Matlock*, 415 U.S. 164, 172–73 (1974) ("the rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence"); *United States v. Killebrew*, 594 F.2d 1103, 1105 (6th Cir. 1979) ("In a suppression hearing to determine probable cause hearsay evidence is admissible."). And, as Officer St. John testified, immediately after the shots were fired, Officer Greene looked over her shoulder and stated that she saw a white SUV driving backwards down the street at a high rate of speed. (*See* Transcript, Doc. 29, 10:8-13.) This is what alerted the officers in the first place and set in motion the entire sequence of events that followed. (*See id.*, 54:13-17) ("It drew our attention to it because we heard shots, and then my partner saw a vehicle driving erratically. . . That's why we started [the] investigation and headed in that direction.") Based on Officer Greene's observation, the two decided to act accordingly: They radioed

6

it in and started in pursuit. They then both observed Mr. Williams continue to drive in a reckless manner consistent with the previously observed illegal backing, for which he was subsequently cited.

Moreover, as background, Officers Greene and St. John are patrol officers, meaning they patrol streets and neighborhoods and handle day-to-day "radio runs." (Transcript, Doc. 29, 5:24-6:16.) They are specifically assigned to District 4—which is where the shooting occurred—and are thus familiar with the area. (*Id*.) In fact, Officer St. John had been to that exact location numerous times in the past and had previously been positioned where Officer Green was situated that day. (*Id.* at 58:17-59:12.) Accordingly, she testified that, based on previous personal experience, she knew Officer Greene had a clear line of sight from where she sat to where the shots were fired from. (*See id.* at 59:10-12.) Based on the totality of circumstances, the Court has no reason to believe that these events did not occur as described.

Accordingly, the Court finds that the officers had probable cause to initiate the traffic stop based on any of the three civil traffic violations for which Mr. Williams was subsequently cited—driving without a license, tinted windows, and illegal backing. *See, e.g., United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020).

***Reasonable Suspicion***. The officers also had reasonable suspicion to believe that, just moments earlier, Mr. Williams had fired a gun at a group of people.

It is well-settled that an officer may initiate a traffic stop when he has reasonable suspicion, "supported by articulable facts[,] that criminal activity may be afoot, *even if the officer lacks probable cause*." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citations omitted,

7

emphasis added). Reasonable suspicion requires "more than a mere hunch," *Navarette v. California*, 572 U.S. 393, 397 (2014), but rather that an officer have "a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). This "is not a high bar." *United States v. Coker*, 648 F. App'x 541, 544 (6th Cir. 2016) (citing *Navarette*, 134 S.Ct. at 1687). An "officer needs only 'a minimal level of objective justification' for the stop, considering the 'whole picture' around him." *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 127 (2000)). This standard "depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act," and "falls considerably short of 51% accuracy, for, as [the Supreme Court has] explained, to be reasonable is not to be perfect." *Kansas v. Glover*, 140 S.Ct. 1183, 1188 (2020) (cleaned up) (emphasis in original).

As discussed above, after hearing six to eight gunshots, Officer Greene looked up and saw a white SUV driving away in reverse at a high rate of speed. To quote Officer St. John, "[i]t definitely raised a level of suspicion after hearing shots ring out and then seeing a car driving [away] in an erratic manner." (Transcript, Doc. 29, 158:9-11.) *See also United States v. Stewart*, No. 519CR000182GFVTMAS, 2020 WL 5889188, at *4 (E.D. Ky. Oct. 5, 2020) ("The Sixth Circuit has indicated that a desire to distance oneself from a scene of investigation can be a factor in the reasonable suspicion analysis."). So the officers decided to follow in pursuit. They quickly caught up and observed the SUV cut off multiple cars and continue to drive recklessly. Less than a minute after they started following in pursuit, the officers heard over the radio that the victims had reported that the shooter (1) shot at them on the 500 block of Ridgeway, (2) was driving a white Infinity

SUV (early 2000s model) with dark tint, and (3) was last seen driving north on Reading Road. All of this reported information was consistent with the officers' own observations.

In other words, the officers observed strong evidence of illegal gun activity (including the sound of gunfire and a car erratically fleeing the scene), which was then subsequently corroborated with a detailed victim account of the same. *See United States v. Galaviz*, 645 F.3d 347, 353 (6th Cir. 2011) ("relevant factors justifying [a] *Terry* stop [include]: (1) the short time (about ten minutes or less) between the occurrence of the armed robbery and [the officer's] observation of Defendant's vehicle; (2) the close geographic proximity of the location of the robbery and the site where [the officer] observed Defendant's car; [and] (3) the color of the vehicle that corresponded to that announced by the police dispatcher. "); *see also, e.g., United States v. Chaplin*, No. 1:16-CR-00001-GNS, 2017 WL 9360839, at *4 (W.D. Ky. Feb. 21, 2017), *report and recommendation adopted*, No. 1:16-CR-00001-GNS, 2017 WL 1365226 (W.D. Ky. Apr. 7, 2017). Based on these "particularized and objective" facts, the officers thus had reasonable suspicion to believe that Mr. Williams had just committed a violent felony.

\*    \*    \*

In sum, the traffic stop was valid since it was based on both (1) probable cause that Mr. Williams had just committed multiple traffic violations, as well as (2) reasonable belief that Mr. Williams had just fired multiple gunshots at a group of victims from the front seat of his white SUV.

## II.   Temporary Detention

Mr. Williams next argues that the officers' degree of intrusion was not reasonably

9

related in scope to the situation at hand, as required under the Fourth Amendment. (*See* Defendant's Closing Brief, Doc. 33, Pg. ID 191.) *See also United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005) ("any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference"). He argues that "the minor traffic infractions alleged here do not justify ordering the driver out of the vehicle at gunpoint, forcing him to walk backwards toward the officers, and then finally kneel on the concrete to be handcuffed and placed in the back of a cruiser." (*Id*. at Pg. ID 190-91.)

The traffic infractions, however, were not what necessitated the officers' response. Rather, it was the fact that the officers reasonably believed Mr. Williams had just fired six to eight gunshots at a group of people. It is well settled that "when police officers reasonably fear that suspects are armed and dangerous, they may order the suspects out of a car and may draw their weapons when those steps are 'reasonably necessary for the protection of the officers.'" *Houston v. Clark Cty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814–15 (6th Cir. 1999) (*quoting United States v. Garza,* 10 F.3d 1241, 1246 (6th Cir. 1993)). "Further, detention in a police cruiser does not automatically transform a *Terry* stop into an arrest." *Id*. (citations omitted). "Nor does the use of handcuffs exceed the bounds of a *Terry* stop, so long as the circumstances warrant that precaution." *Id*.

The facts here are similar to those in *Houston*. There, the officers drew and aimed their weapons based on a reasonable belief that the car's occupants had been involved in a shooting. On the basis of that reasonable belief, their use of handcuffs and the detention of the men was reasonably necessary to protect the officers' safety. *Id.* at 815. Such is the

10

case here. The officers had stopped a vehicle matching the radio call's description of the shooter. Based on the facts the officers knew at the time, the occupant of the vehicle could have still been armed. Thus, their response when he exited the vehicle was reasonably necessary to protect their safety during their investigation. *See id.*; *see also, e.g., United States v. Hudson*, 405 F.3d 425 (6th Cir. 2005).

### III.  Warrantless Search of SUV

Lastly, Mr. Williams contends that the warrantless search of his SUV was unlawful. Generally, the Fourth Amendment requires that the police obtain a warrant before searching property. *See United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002) (citing *Florida v. Royer*, 460 U.S. 491, 497 (1983)). But under the automobile exception to the warrant requirement, if probable cause exists to believe that a vehicle contains contraband, "the Fourth Amendment permits police to search the vehicle without more." *Id.* (cleaned up). Probable cause demands a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "When deciding whether this fair probability exists, courts must view the totality of the circumstances through the common-sense lens of ordinary people, not the technical lens of trained lawyers." *United States v. Sheckles*, 996 F.3d 330, 337 (6th Cir. 2021) (Murphy, J.) (cleaned up).

For the same reasons the officers had reasonable suspicion to initiate the traffic stop, they also had probable cause to believe that evidence of a crime would be found in his SUV. Consider what they knew at the time. Both officers heard six to eight gunshots fired from roughly two blocks down the street. They both looked up and Officer Greene

11

saw a white SUV erratically driving backwards, away from where the gunfire had emanated, at a high rate of speed. Based on the SUV's close temporal and geographic proximity to where the shots had been fired, as well as the evasive manner in which it was driving away, the officers radioed it in and started following. Less than a minute later, they heard over the radio that a small group of people had flagged down a Sheriff's Deputy as he was reporting to the scene of the gunfire. The victims reported that the shooter (1) shot at them on the 500 block of Ridgeway, (2) was driving a white Infinity SUV with dark tint, and (3) was last seen driving north on Reading Road—all of which was entirely consistent with the officers' own observations. Moreover, these victims were not anonymous. *See Nuyen*, 833 F. App'x at 647 ("A confidential tip, corroborated by independent investigation, can suffice."). They were individuals who were known to the police and made subsequent reports about the shooting.

In short, the victims provided a detailed, credible account of the shooting, including the make, type, and color of Mr. Williams' vehicle; the tint of his windows; the location of the crime; and his direction of travel—all of which was corroborated by the officers' own contemporaneous observations. And, since Mr. Williams had allegedly fired the gunshots from inside his SUV, it was reasonable for the officers to believe that there was a fair probability that the SUV would contain the gun he fired, the shell casings of ammo he had fired, any additional evidence of his motivations for doing so, or all of the above. It does not matter that the officers "could have easily applied for a warrant," as Mr. Williams contends (*see* Motion, Doc. 18, Pg. ID 50), because even though they "might have had time to secure a warrant to search the automobile, there was no

12

requirement that [they] do so." *United States v. Smith*, 510 F.3d 641, 650 (6th Cir. 2007).

Accordingly, the warrantless search of Mr. Williams' SUV was supported by adequate probable cause and thus valid under the automobile exception. And since the Court has found that the search was valid as such, it need not consider whether it was valid under any other exception to the warrant requirement.

## CONCLUSION

In short, Officers Greene and St. John personally observed Mr. Williams commit multiple civil traffic violations. That constitutes probable cause to initiate the initial traffic stop. They also had both reasonable suspicion and probable cause to believe that Mr. Williams had just committed a violent felony firearms offense. This, in turn, not only justified the initial traffic stop, but also Mr. Williams' detention in the back of their cruiser (out of "reasonable fear" that he was armed and dangerous) and the warrantless search of his SUV. Accordingly, both of Mr. Williams' Motions to Suppress (Docs. 18 & 27) are hereby **DENIED**.

**IT IS SO ORDERED.**

                                              UNITED STATES DISTRICT COURT
                                              SOUTHERN DISTRICT OF OHIO

By: *Matthew W. McFarland* (signature)
                                              JUDGE MATTHEW W. McFARLAND